## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

JAMIE WARSINSKI,
     *Plaintiff*,

*v.*                   CASE NO. 13-CV-14136

COMMISSIONER OF         DISTRICT JUDGE NANCY G. EDMUNDS
SOCIAL SECURITY,       MAGISTRATE JUDGE CHARLES E. BINDER

     *Defendant*.
_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION[1]

### I.    RECOMMENDATION

This Court **RECOMMENDS** that Plaintiff's Motion for Summary Judgment (docket 17) be denied, that Defendant's Motion for Summary Judgment (doc. 22) be granted, and the decision of the Commissioner be **AFFIRMED**.

### II.    REPORT

#### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to this magistrate judge for the purpose of reviewing the Commissioner's decision denying Plaintiff's claim for a period of disability and disability insurance benefits (DIB), and supplemental security income benefits (SSI). The matter is currently before this Court on cross-motions for summary judgment.[2] (Docs. 17, 22, 24.)

---

[1]The format and style of this Report and Recommendation comply with the requirements of Fed. R. Civ. P. 5.2(c)(2)(B). This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

[2]The Court has reviewed the pleadings and dispenses with a hearing pursuant to Eastern District of Michigan Local Rule 7.1(f)(2).

Plaintiff filed an application for a period of disability, DIB and SSI on January 26, 2010, alleging that she became unable to work on November 20, 2007; she later amended the alleged onset date to October 20, 2005. (Transcript, Docs. 12 and 13 at 20, 221-24, 225-28, 281-82.) Plaintiff's claims were denied at the initial administrative stages. (Tr. 116-35, 137-52.) On January 20, 2012, Plaintiff appeared at a video hearing before Administrative Law Judge ("ALJ") David F. Neumann, who considered the application for benefits *de novo*. (Tr. 20, 42.) In a decision dated February 17, 2012, the ALJ found that Plaintiff was not under a disability within the meaning of the Social Security Act at any time from October 20, 2005, through the date of the ALJ's decision. (Tr. at 35.) Plaintiff requested Appeals Council review of this decision. (Tr. 12-16.)

The ALJ's decision became the final decision of the Commissioner, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), on June 24, 2013, when the Appeals Council denied Plaintiff's request for review. (Tr. 6-11.) On September 27, 2013, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision.

### B.  Standard of Review

Pursuant to 42 U.S.C. § 405(g), this Court has jurisdiction to review the Commissioner's final decisions.  Judicial review of the Commissioner's decisions is limited to determining whether his findings are supported by substantial evidence and whether he employed the proper legal standards. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). Substantial evidence is "more than a scintilla . . . but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)(quoting *Cutlip v. Sec'y Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)); *see also Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting

*Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Walters*, 127 F.3d at 528. It is not the function of this Court to try cases *de novo*, resolve conflicts in the evidence or decide questions of credibility. *See Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

In determining the existence of substantial evidence, the court must examine the administrative record as a whole. *See Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even if the reviewing court would decide the matter differently, *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports another conclusion. *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). "The substantial evidence standard presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)(citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)(en banc)(citations omitted)).

"Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006)("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party")(citations omitted); *Van Der Maas v. Comm'r of Soc. Sec.*, 198 Fed. Appx. 521, 526 (6th Cir. 2006).

### C.    Governing Law

Disability for purposes of DIB and SSI is defined as the:

> [I]nability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505(a)(DIB), 416.905(a)(SSI).

Plaintiff's Social Security disability determination is to be made through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston,* 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin v. Barnhart,* 475 F.3d 727, 730 (6th Cir. 2007).

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his] impairments and the fact that [he] is precluded from performing [his]

past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003)(cited with approval in *Cruse v. Comm'r of Soc. Sec.,* 502 F.3d 532, 540 (6th Cir. 2007)); *see also Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994)("[c]laimant bears the burden of proving his entitlement to benefits."). If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the Commissioner. *See Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [claimant] could perform given [his] RFC [residual functional capacity] and considering relevant vocational factors." *Rogers,* 486 F.3d at 241 (citing 20 C.F.R. § 416.920(a)(4)(v), (g)); *see also* 20 C.F.R. § 404.1520(a)(4)(v), (g).

## D.    ALJ Findings

The ALJ applied the Commissioner's five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff met the insured status requirements through September 30, 2009, and had not engaged in substantial gainful activity since October 20, 2005, the amended alleged onset date. (Tr. 23.) At step two, the ALJ found that Plaintiff's bipolar disorder, posttraumatic stress disorder (PTSD), personality disorder, and history of alcohol and cannabis abuse were "severe" within the meaning of the second sequential step. (Tr. 23.) At step three, the ALJ found no evidence that Plaintiff's combination of impairments met or equaled one of the listings in the regulations. (Tr. 23-24.) The ALJ found that the Plaintiff had the residual functional capacity (RFC) to perform a full range of work at all exertional levels with the following limitations:

> [T]he claimant requires simple, unskilled, work with one, two, or three step instructions, at a (sic) SVP 1 or 2. The claimant cannot work around unprotected heights and moving machinery and requires non-production oriented work. The claimant can perform work with occasional interaction with supervisors, coworkers,

or the general public; cannot work as a member of a team; and can have only occasional changes in the work setting. (Tr. 24.)

At step four, the ALJ found that Plaintiff could not perform any of her past relevant work. (Tr. 33.) At step five, the ALJ found that Plaintiff could perform jobs existing in significant numbers in the national economy and therefore she was not suffering from a disability under the Social Security Act. (Tr. 34-35.)

### E.    Administrative Record

Plaintiff was 34 years old at the time of the hearing. (Tr. 46.) Plaintiff testified that she is right-handed, she is 5'10" tall and weighs about 189 pounds. (Tr. 46.) Plaintiff has an associate's degree that she completed in 1999, with a double major in early education and business and a double minor in computers and child psychology. (Tr. 47.) Plaintiff testified that her daughter and her son were taken from her after she had been charged with child abuse and neglect in August 2006, and in May 2011 her newborn was taken from her custody. (Tr. 48.) She later testified that she had recently given her parents custody of her four children because they could not determine what was "going on" with her. (Tr. 65.)

Plaintiff testified that she last tried to work in 2007. (Tr. 53.) She explained that she was working two jobs for a portion of a three-month period; she quit one job when she started having increased episodes of seizures and she was released from work at the other after she injured her shoulder. (Tr. 54.) Plaintiff later testified that she switched jobs when the work at one of the jobs dropped from twice a week to once a week. (Tr. 57.) She testified that in one of her most recent jobs, as a loading dock attendant, she lifted and carried about 40 pounds and pushed or pulled no more than about 40 pounds. (Tr. 54, 56.) She spent two hours at a time walking or standing. (Tr. 57.) She sat for only about a half-hour during a four to five hour shift. (Tr. 57-58.) In that job she

had to check the inventory against a list, to make sure the order was correct, and note any damaged goods. (Tr. 58.)

Plaintiff testified that she is prevented from working because she gets easily confused, she has episodes in which she loses track of time, and she gets agitated and has trouble controlling her agitation. (Tr. 48.) She testified that she gets "sick a lot," and that being "stressed out" results in her being physically ill. (Tr. 48.) She testified that she has episodes where she becomes unconscious. (Tr. 28.) She testified that "they're still trying to figure out what they are and it's frustrating because no employer will hire me until I have an absolute determination of what it is and why. And I have problems walking, problems talking, sometimes my heart can even stop beating in these episodes." (Tr. 48-49.) She testified that she has irregular heartbeats following the episodes, and she is sometimes unable to speak, walk or move her right side for hours or days. (Tr. 48.) She testified that she also has periods of amnesia when she forgets where she is and what she is doing and she becomes disoriented. (Tr. 51.) She described that it impairs her ability to be a parent. (Tr. 51.) Plaintiff testified that her symptoms have been essentially unchanged, that some medications have made it worse and that one medication left her "in a state of continual grand mals" that required she be in the hospital. (Tr. 52.) She testified that this was the result of an allergic reaction to Lamictal and Topamax. (Tr. 52.) She explained that Depakote caused more seizures and Trileptal cause mood disturbances making her "more bipolar" and causing "hysterical episodes." (Tr. 52.) She later testified that she has not seen a change in her condition with medication, but that the attention deficit medication helped and the Ativan for anxiety was helpful. (Tr. 59.) She testified that the medications help with confusion, anxiety and the nervousness that causes her symptoms. (Tr. 59-60.)

Plaintiff described that she normally has three to four good days per week, when she takes care of her personal needs, shops, cooks three-course meals, cleans (including vacuuming, sweeping and mopping), does yard work, takes out the trash, does laundry and washes dishes. (Tr. 61-62.) On her "bad days" she stays in bed because she has too many falling episodes and loses her balance easily. (Tr. 63.) Plaintiff testified that she normally cannot watch television for more than an hour and she explained, "I can't watch any of it on a flat screen TV like we're communicating over because if I do I will be immediately in to a migraine and I can have up to six or seven episodes from just watching TV or even being on the computer for longer than an hour." (Tr. 63-64.) She explained that to watch television she has to be in a reclining position in bed with a pillow under her head or else she feels as if she is falling. (Tr. 64.)

She testified that she has a "vast amount" of interests, including painting, drawing, writing books and illustrating her own children's books, but she is limited because she will "fall out" in the middle of her work and will not remember what she is doing. (Tr. 66.) She testified that her driver's license is currently suspended. (Tr. 63.) Upon questioning from the ALJ about recreational drug use, Plaintiff responded that she does not use recreational drugs, stating that she "ended up allergic to marijuana." (Tr. 66.) She testified that she had used alcohol in the past; in 2002 she was one year sober, she started using again in August 2006 until around 2008 when she had "one drink" and she has been sober since August 2009. (Tr. 67.) The ALJ pointed out that the record shows she was clean since August 6, 2010, with which Plaintiff agreed. (Tr. 67.)

Upon questioning from the ALJ, Plaintiff testified that she has been compliant with treatment to the best of her ability. (Tr. 52-53.) Plaintiff testified at the hearing that she was without insurance. (Tr. 70.)

8

At the hearing, the ALJ clarified with Plaintiff's representative that the basis for alleging disability was non-exertional. (Tr. 61.) The representative stated that "[s]he may have exertional limitation (sic) but there are no medically determinable impairments which support them. So this is a psychological case and any limitations that she has are non-exertional in my opinion." (Tr. 61.)

The ALJ found that Plaintiff had past relevant work as a receptionist and retail clerk. (Tr. 33.) The vocational expert ("VE") reported and testified that Plaintiff's past work as a receptionist was semi-skilled, had a specific vocational preparation code (SVP) of 4 and was sedentary in exertion per the Dictionary of Occupational Titles (DOT) with transferable skills to "other semi-skilled light and sedentary general office work." (Tr. 98-99, 283.) Her work as a retail clerk was semi-skilled, SVP 3 and light in exertion per the DOT. (Tr. 283.) The ALJ asked the VE to consider an individual of Plaintiff's age, education and work experience who is limited as follows:

> [She] would require work which is simple, unskilled work activity only involving one, two or three-step instructions at an SVP: 1 or 2. Who should avoid unprotected heights and moving machinery, who's work would be non-production oriented,
>
> . . . .
>
> Occasional contact with supervisors, coworkers and the public but claimant cannot function as a member of – but the person cannot function as a member of a team and have only occasional changes in the work setting. (Tr. 99.)

The VE testified that such a person could not perform Plaintiff's past work. (Tr. 99.) The VE gave the following positions at the light exertional level that such an individual could perform: inspector with 14,000 jobs in southeast Michigan, twice as many jobs in the state, with a representative DOT code of 762.687-014, small products assembler with 7,000 jobs in southeast Michigan, twice as many statewide, with a representative DOT code 706.684-022, both positions with an SVP 2.

For the second hypothetical question, the ALJ asked the VE to consider the same limitations as set forth in the first hypothetical question, with the additional limitations:

The person could only lift and carry 10 pounds frequently and 20 pounds occasionally, stand and walk with normal breaks for a total of six hours in an eight-hour workday, sit with normal breaks a total of six hours in an eight-hour workday. Perform pushing and pulling motion with her upper and lower extremities within those weight restrictions and can perform each of the following postural activities occasionally, climbing ramps and stairs, balancing, stooping, kneeling, crouching and crawling. (Tr. 100.)

The VE testified that the previous jobs he supplied would still be available. (Tr. 100.)

Finally, the ALJ asked the VE to consider "a hypothetical person the claimant's age, education and work experience who would be absent from work five times per month." (Tr. 100.) The VE testified that "[i]f that's on a consistent basis such a person would be unable to sustain any competitive work." (*Id.*) Plaintiff's representative had no questions for the VE. (*Id.*)

### F.    Analysis

Plaintiff contends that the ALJ's RFC is deficient because it does not include all of her limitations and it "fails to build an accurate and logical bridge between evidence and result." (Doc. 17 at 16.)

### 1.    Whether The ALJ Properly Assessed Plaintiff's Mental Impairments

Plaintiff argues that the ALJ improperly considered her Global Assessment of Functioning (GAF) scores[3] in his analysis. Plaintiff alleges that the ALJ's decision "focuses not on the *notes* and *assessment* of Plaintiff's treaters generally, but instead largely references GAF scores, associating particular scores to the DSM-IV." (Doc. 17 at 17.) I suggest that the ALJ did not err in considering GAF scores along with the other evidence of record. "A GAF score may help an

---

[3]"GAF is a clinician's subjective rating, on a scale of zero to 100, of an individual's overall psychological functioning. At the low end, GAF 1-10 indicates '[p]ersistent danger of severely hurting self or others (e.g., recurrent violence) or persistent inability to maintain minimal personal hygiene or serious suicidal act with clear expectation of death.' *DSM-IV-TR* at 34 (boldface and capitalization omitted). At the high end, GAF 91-100 indicates '[s]uperior functioning in a wide range of activities, life's problems never seem to get out of hand, is sought out by others because of his or her many positive qualities. No symptoms.' *Id.* (boldface omitted)." *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 503 n.7 (6th Cir. 2006).

ALJ assess mental RFC, but it is not raw medical data. Rather, it allows a mental health professional to turn medical signs and symptoms into a general assessment, understandable by a lay person, of an individual's mental functioning." *Kornecky*, 167 Fed. Appx. at 503 n.7. In *Kennedy v. Astrue*, 247 Fed. Appx. 761, 766 (6th Cir. 2007), the court criticized the ALJ's use of GAF scores where the ALJ relied on an increase from a GAF of 55 to a GAF of 60 to find that the plaintiff had an improvement in mental functioning. *See id*. The *Kennedy* court noted that "the improvement in score alone has not been shown to be significant in this case since the 1995 GAF score (55) is in the same range as the 2003 score (60). Both scores indicate moderate symptoms or moderate difficulty in social, occupational or school functioning." *Id.* Contrary to Plaintiff's allegation in the instant case, the ALJ did not rely solely on Plaintiff's GAF scores to make his findings, but mentioned them in the context of considering the diagnoses, treatment notes and assessments by Plaintiff's treaters and examiners. The ALJ did not err in considering Plaintiff's GAF scores in making his findings.

Plaintiff also cites excerpts from the same records the ALJ cited. Plaintiff relies on *Lowery v. Comm'r of Soc. Sec.*, 55 F. Appx. 333, 339 (6th Cir. 2003), for the premise that the "ALJ may not select and discuss only that evidence that favors his ultimate conclusion, but must articulate, at some minimum level, his analysis of the evidence to allow the appellate court to trace the path of his reasoning." *Id.* (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)).

In the instant case, Plaintiff's brief sets forth a presentation of evidence purporting to counter various record statements that the ALJ included in his decision. For example, Plaintiff argues that the ALJ's note that Plaintiff had "basic employment skills and often accepted under the table positions" does not tell the full story. (Doc. 17 at 18.) The complete sentence by the ALJ, however, does indicate that Plaintiff "reported in August of 2009 that she has difficulty with

11

activities of daily living but also that she has basic employment skills and often accepts 'under the table positions.'" (Tr. 29.) The evidence is from a multi-page Individual Plan of Service Meeting report dated June 4, 2009, and completed with Patricia Dixon, LMSW, in which it was noted that Plaintiff "has some basic employment skills and is able to prepare a resume on her own," "is able to complete applications," and "often accepts 'under the table' positions on impulse and becomes easily overwhelmed by demands."  (Tr. 503-507.) A review of the ALJ's decision in the context of the evidence of record does not suggest that the ALJ cherry-picked the evidence. From that particular record, he cited difficulties with activities of daily living, strength in having some basic employment skills, and noted that she was accepting "under the table" positions. (Tr. 503.) The ALJ's decision shows that he considered a variety of evidence showing Plaintiff's limitations and remaining abilities. For example, the ALJ's decision also noted that she struggled with attending therapy, she reported relying on others for assistance, a 2008 treatment note indicated poor concentration, and she had more emotional outbursts without medication. (Tr. 28, 29, 350, 406, 414-15, 494, 503, 540.)

    As set forth above, an ALJ "can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." *Kornecky*, 167 Fed. Appx. at 508 (citation omitted). The ALJ has not painted only a one-sided picture of Plaintiff. However, within this vast record there may be substantial evidence to support more than one outcome. If the Commissioner's decision is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the matter differently and even where substantial evidence supports a different conclusion. *McClanahan v. Comm'r of Soc. Sec.,* 474 F.3d 830, 833 (6th Cir. 2006); *Mullen,* 800 F.2d at 545.

Next, Plaintiff argues that Plaintiff underwent a psychological consultative examination in which Terry L. Rudolph, Ph.D., Licensed Psychologist, reported that Plaintiff had a "serious impairment in social and occupational functioning with a prognosis of guarded." (Doc. 17 at 19.) Plaintiff argues that the ALJ erred in failing to explain the weight he gave to Dr. Rudolph's February 8, 2010 opinion. (Tr. 30, 606-08.)  Under the diagnosis section of his opinion, Dr. Rudolph noted next to Axis V, "Current GAF 50 (Serious impairment in social and occupational functioning)." (Tr. 608.) The reference appears to be a recitation of the range in which Plaintiff's GAF score falls, the very same GAF score Plaintiff also argued could not be relied upon by the ALJ. Dr. Rudolph summarized his examination of Plaintiff as follows:

> [Plaintiff] is a thirty-two year old female who was referred for psychological evaluation pursuant to her claim for medical benefits. [Plaintiff] alleged a myriad of psychological and neurological problems including seizures, memory loss, anhedonia and feelings of helplessness and hopelessness. [Plaintiff] has a history of one psychiatric hospitalization over two years ago. She is not currently in any active treatment and does not take any prescription medications. [Plaintiff] was alert, verbal and oriented to all three spheres during today's interview and testing. She was readily able to register and recall new material. Her fund of general information was intact. [Plaintiff] was able to perform simple and sequential computations. She was able to deal with abstract verbal material. [Plaintiff's] formal judgment was adequate. (Tr. 608.)

Dr. Rudolph diagnosed major depressive disorder, recurrent, severe, and cluster B personality features (borderline, histrionic). (Tr. 608.) He noted that her prognosis was "guarded." (Tr. 608.) Plaintiff has not identified any inconsistencies between Dr. Rudolph's opinion and the ALJ's findings and resultant restrictive RFC.  I am unable to find inconsistencies between the ALJ's findings and Dr. Rudolph's opinion and I suggest that there is no error in the ALJ's consideration and citation to the opinion in his decision. (Tr. 30.) Plaintiff has not identified a reason that the ALJ's decision should be remanded for the ALJ to assign weight to an examining psychologist's opinion when it is clear that the ALJ considered the opinion and there is no

identifiable inconsistency between that opinion and the ALJ's findings. *See Kornecky*, 167 Fed. Appx. at 507 ("Here, . . . the ALJ neither misstated nor ignored a treating physician's opinion; he merely failed to explain why he favored several examining physicians' opinions over another's.").

> While it might be ideal for an ALJ to articulate his reasons for crediting or discrediting each medical opinion, it is well settled that:
>
>> [a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party. Nor must an ALJ make explicit credibility findings as to each bit of conflicting testimony, so long as his factual findings as a whole show that he implicitly resolved such conflicts. *Id.* (Citations omitted).

Plaintiff argues that the ALJ "appeared to rely on no medical opinion in coming to his assessment." (Doc. 17 at 20.) Plaintiff also alleges the following: "The ALJ's rationale for discounting the records and mental illness was that 'nothing in the record establishes a period when the claimant had significant limitations of 3-4 days per week for a period of 12 continuous months.'" (Doc. 17 at 20.) Plaintiff argues that the ALJ has identified no requirement for such a restriction, "nor does he highlight any records reflecting higher functioning." (Doc. 17 at 20.)

The ALJ considered Plaintiff's testimony that she only has three to four good days per week, related to the alleged frequency of her "seizure" activity. He considered the "three to four day per week" limitation in the context of making a credibility finding and compared her testimony to the other evidence of record, including objective medical evidence. He concluded that these statements were not supported by the other evidence of record. (Tr. 33.) The ALJ did not err in noting that there was no twelve month period where the record shows limitations at the frequency and severity to which had Plaintiff testified. The regulations require that a severe medically determinable impairment to establish disability "must have lasted or must be expected to last for a continuous period of at least 12 months. We call this the duration requirement." 20 C.F.R. §§

404.1509, 416.909.  His reference was merely a restatement of his prior consideration of the alleged frequency to which Plaintiff had testified. Further, this was not the sole basis for either the ALJ's final decision or his credibility determination, but only one factor.

Plaintiff also argues that the ALJ "seemingly ignored Plaintiff's ADHD and any limitation it would have on Plaintiff's impairments, despite the fact it is continually noted by her treaters." (Doc. 17 at 22.) The ALJ did not mention ADHD as either a severe impairment or a non-severe impairment. (Tr. 23.) The ALJ noted that at a psychiatric examination in October 2005, Plaintiff was diagnosed with a "past history of attention deficit hyperactivity disorder." (Tr. 26.)  The October 2005 psychiatric evaluation notes Plaintiff's reported that "[s]he had been previously diagnosed as ADHD as a child but not able to relate that she has been on stimulants necessarily." (Tr. 740.) The doctor diagnosed Plaintiff with a "[h]istory of post traumatic stress disorder, history of dysthymia, past history of ADHD, depression, NOS." (Tr. 742.) She was prescribed Zoloft. (*Id.*) When she returned on December 27, 2005, it was noted that she failed to show up following the initial evaluation.

The ALJ also noted that at a psychiatric evaluation on May 9, 2011, Plaintiff was diagnosed with dissociative disorder NOS, ADHD, PTSD, alcohol dependence in remission, borderline personality disorder, and a GAF of 50. (Tr. 31, 787.) No limitations related to ADHD were reported. Plaintiff's speech was noted as "spontaneous" and thought process "logical." (Tr. 790.) The doctor noted that Plaintiff was "pretty stable at this time from psych standpoint. Given pregnancy status will NOT add any psych medications at this time." (Tr. 792.)

As Defendant argued in her brief, Plaintiff fails to point out evidence of limitations related to the ADHD that were not otherwise accounted for in the ALJ's decision. Although it is not dispositive, it is worth noting that, as Defendant points out, when Plaintiff applied for disability,

she did not raise ADHD as one of the mental conditions that limit her ability to work. (Tr. 247.) As Defendant agues in her brief, Plaintiff was able to earn an associate's degree with both double majors and double minors despite a history of ADHD. The ALJ considered Plaintiff's ability to concentrate with and without medication. (Tr. 33.) I suggest that any failure to designate ADHD as severe or non-severe was harmless error where the ALJ considered the ADHD as well as records from examiners who considered the ADHD, and there is no evidence of limitations related to the same that were not already addressed by the RFC. *See generally Borum v. Comm'r of Soc. Sec.,* 2011 WL 6968321 at *9-10 (E.D.Mich. Dec. 20, 2011) (citing *Maziarz v. Sec'y of Health and Human Servs.,* 837 F.2d 240, 244 (6th Cir. 1987)).

The ALJ followed the prescribed rules for evaluating Plaintiff's mental impairments. *See* 20 C.F.R. §§ 404.1520a, 416.920a. The ALJ properly measured the severity of Plaintiff's mental disorder in terms of four functional areas, known as the "B" criteria, by determining the degree of limitation in each area. *See* 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3). The ALJ determined that Plaintiff has mild limitations in activities of daily living, moderate limitations in social functioning and moderate limitations in maintaining concentration, persistence and pace and that there have been no episodes of decompensation. (Tr. at 16.) In making these findings, the ALJ considered the medical records and other evidence of record, including Plaintiff's testimony and reports. (Tr. 23-24.) The ALJ gave reasons to support the limitations set forth in each of the areas of functioning. (Tr. 23-24.) The ALJ's findings are supported by Dr. Rudolph's consultative Mental Status Evaluation on February 8, 2010 and the consultative evaluation by Ron Marshall, Ph.D., on May 6, 2010. (Tr. 608.) Dr. Marshall concluded that Plaintiff has mild limitations in activities of daily living and social functioning and moderate limitations in maintaining concentration, persistence and pace. (Tr. 30, 121-22.)

Plaintiff argues that the ALJ erred in assessing her seizure disorder or "spells" and migraines. (Doc. 17 at 23.) Plaintiff argues that in 2004, "monitoring observed three habitual events that were observed by treaters and several events detected during sleep but EEGs and MRIs were normal . . . ." (Doc. 17 at 24.) Plaintiff concedes that there is no evidence in EEGs or MRIs of seizure activity. (Doc. 17 at 24.) Plaintiff argues that the ALJ erred in noting that the CT's have been negative and using this evidence to find the episodes non-severe and find against Plaintiff's credibility. (Doc. 17 at 24.) Plaintiff argues that the ALJ "simply made a lay medical judgment regarding Plaintiff's impairments, in error." (Doc. 17 at 25.) Plaintiff argues that "objective evidence reflects consistency with Plaintiff's testimony that she experiences the non-epileptic spells (with an objective record noting them occurring 1-2 times per day), which as the VE testified would be work preclusive." (Doc. 17 at 25.)

Social Security Ruling (SSR) 96-4p states that "the regulations . . . provide that under no circumstances may the existence of an impairment be established on the basis of symptoms alone. Thus, regardless of how many symptoms an individual alleges, or how genuine the individual's complaints may appear to be, the existence of a medically determinable physical or mental impairment cannot be established in the absence of objective medical abnormalities; i.e., medical signs and laboratory findings." SSR 96-4p. "In addition, 20 CFR 404.1529 and 416.929 provide that an individual's symptoms, such as pain, fatigue, shortness of breath, weakness, or nervousness, will not be found to affect the individual's ability to do basic work activities . . . unless medical signs and laboratory findings show that there is a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptom(s) alleged." SSR 96-4p.

The ALJ considered and cited extensive medical records that dealt with Plaintiff's reports of seizure activity, resultant treatment notes and the normal objective medical signs and laboratory findings. (Tr. 26-32.) Plaintiff's allegation that the "objective record" notes the spells or episodes occurring 1-2 times per day is not supported by the evidence. (Doc. 17 at 25.) Plaintiff cites the October 16, 2009 neurological consultation to support this assertion. (Tr. 3526-38.) The report notes Plaintiff's statement that "these episodes occur to one degree or another once or twice per day since 2003, . . . ." (Tr. 2536.) Plaintiff's report is not objective medical evidence that the spells or episodes occur or occur with such frequency.

Plaintiff goes back as far as 2004, prior to the alleged onset date, to reference treatment records showing that she complained of episodes of 'shaking or tremors', thought to be nonepileptic events. (Tr. 808.) During an admission to the epilepsy unit at the Detroit Medical Center, Plaintiff had "three clinical events" on June 22, 2004, described as "typical of her symptoms, which she described as seizures." (Tr. 808.) EEG testing showed no changes and her EEG was normal, as was lab testing both before and after the events. (*Id.*) In a September 2004 neurology examination she was diagnosed with nonepileptic events and Dr. Aash K. Shah, M.D., noted "[m]ultiple psychiatric problems with possible depression, and maybe posttraumatic stress disorder." (Tr. 809.) As the ALJ noted in his decision, the doctor concluded that he "did not have any further concerns regarding real epileptic seizures . . . . [T]his appears to be mainly psychiatric in nature and not neurologic in nature." (Tr. 26, 809.) The ALJ noted that examinations in 2006 revealed no neurological defects, similarly, with respect to the complaints of headaches, and CT scans of the brain in 2006, 2007, 2009 and 2011 were negative and/or "considered within normal limits." (Tr. 26, 27, 30, 390-403, 720-21, 1209-62, 1290, 1804, 2542, 2557.) MRI's were also essentially "unremarkable," for example, in 2009. (Tr. 2534.)

Plaintiff argues that these episodes continued and by 2009 they were occurring twice per day. (Doc. 17 at 24.) Plaintiff argues that the "most recent episode notes ongoing question of seizure versus non-epileptic spells," and cites to records of a hospital stay from June 29 until July 4, 2011. (Tr. 720-31.) The records note that Plaintiff was advised to follow-up at an epilepsy clinic for the issue of "Epileptic vs. Non-Epileptic Spells," and there continued to be no objective medical evidence of epileptic seizure activity. (Tr. 727.) The same report notes that Plaintiff had "one event that was captured on EEG. No seizure activity was detected at that time." (Tr. 726-27.) Electrolyte levels were normal. (Tr. 727.) Plaintiff was discharged home and advised to restart antiepileptic medication Trileptal. (Tr. 727.)

The ALJ pointed out that in June 2011, Plaintiff reported to the emergency department with complaints of having had "4 episodes consistent with her typical semiology." (Tr. 713.) Plaintiff reported having "4 episodes between 3 to 6 p.m." (Tr. 713.) Her boyfriend reported witnessing the events. (Tr. 713.) William Dauer, M.D., noted "no evidence of nonconvulsive status epilepticus on her exam at this time." (Tr. 719.) A July 2, 2011 EEG was normal. (Tr. 722-25.)

Similarly, in July 2011 Plaintiff reported to the emergency department and her partner reported that Plaintiff was "acting like she is going to have a seizure" and that she had one earlier that day. (Tr. 1617.) The examining doctor reported that no current seizure activity was noted and that Plaintiff was "[n]ot postictal." (Tr. 1618.) She "did not bite tongue" and she was "[a]lert, oriented with normal speech." (Tr. 1618.) She was discharged with prescriptions for Trileptal. (Tr. 1619.)

The ALJ did not make a lay medical judgment, as Plaintiff asserts. There is simply no objective medical evidence, signs or test results to support a seizure-related physical impairment.

The ALJ's findings in this area are supported by the evidence of record and the evidence on which the ALJ relied in his decision. (Tr. 26-33.)

Based on the lack of objective medical evidence, I further suggest that the ALJ did not err in concluding that Plaintiff did not have a severe physical impairment. While the ultimate decision is the ALJ's, it is worth noting that the ALJ also discussed this at the hearing with Plaintiff's attorney, who confirmed that he did not believe the record supported medically determinable impairments to support exertional limitations. (Tr. 61.) The ALJ's findings regarding Plaintiff's severe impairments are supported by substantial evidence.

## 2.    Whether The ALJ's Credibility Determination Is Supported By Substantial Evidence

Plaintiff argues that the ALJ's credibility determination is based on "flawed reasoning." (Doc. 17 at 26.) She argues that the ALJ improperly considered her compliance with treatment without considering her ability to afford treatment and her bipolar condition, and failed to make inquiry at the hearing about Plaintiff's lack of care. (Doc. 17 at 26.) She also argues that the ALJ "implied Plaintiff's mental impairments were better controlled by drugs when she took them," and appears to argue that the ALJ improperly focused on the objective medical evidence. (Doc. 17 at 26.)

The ALJ is required by the Regulations to explain his credibility determination with respect to Plaintiff's symptoms. 20 C.F.R. §§ 404.1529, 416.929; *see also* SSR 96-4p and 96-7p. "[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witnesses's demeanor and credibility." *Walters,* 127 F.3d at 531. Credibility assessments are not insulated from judicial review. Despite deference due, such a determination must nevertheless be supported by substantial evidence and contain specific reasons for the weight the adjudicator assigned to the individual's

statements. *See id.*; SSR 96-7p. To the extent that the ALJ found that Plaintiff's statements are not substantiated by the objective medical evidence in the record, the Regulations explicitly provide that "we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work . . . solely because the available objective medical evidence does not substantiate your statements." 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2). In addition to objective medical evidence, the ALJ must consider all the evidence of record in making his credibility determination. *See* 20 C.F.R. §§ 404.1529(c)(2), (3), 416.929(c)(2), (3); *see also Felisky*, 35 F.3d at 1039-41. Relevant factors to be considered include the following: daily activities, location, duration, frequency and intensity of pain and other symptoms, precipitating and aggravating factors, medicine including the type, dosage, effectiveness and side effects, treatment for relief of pain or other symptoms, any measures used to relieve pain, and "[o]ther factors concerning your functional limitations and restrictions due to pain or other symptoms." 20 C.F.R. §§ 404.1529(c)(3)(I)-(vii), 416.929(c)(3)(I)-(vii).

An ALJ is not precluded from focusing on the objective medical evidence in considering limitations and restrictions related to symptoms. As set forth above, the analysis of symptoms and resultant limitations starts with the "existence of a medically determinable physical or mental impairment," which "cannot be established in the absence of objective medical abnormalities; i.e., medical signs and laboratory findings." SSR 96-4p. The ALJ properly considered the objective medical evidence of record in his findings, including in the context of Plaintiff's credibility.

The ALJ did not limit his credibility determination to the objective medical evidence. The ALJ is required to consider treatment and the effectiveness of medication and any side-effects. The ALJ relied on notes in the record indicating that medication was effective when taken, and also cited notes indicating that Plaintiff did not always remember to take her medication. (Tr. 28.)

21

Plaintiff treated at Blue Water Counseling in 2007. In August 2007, Plaintiff presented for a medication review. It was noted that she "does not always remember to take her medications and, when she does, she does not necessarily take them at the proper times." (Tr. 329.) Mario Lanni, M.D., noted that Plaintiff reported she "feels better, has less racing thoughts, and is able to complete tasks." (Tr. 329.) In September 2007, Plaintiff reported feeling "like a new person" with Concerta. (Tr. 352.) Plaintiff was discharged from Blue Water Counseling on November 5, 2007, with the diagnoses bipolar disorder, ADHD combined, and personality disorder with a GAF of 37. (Tr. 355.) She was reportedly discharged due to "[d]iscontinuing treatment against advice." (Tr. 356.) It was noted that she "improved on remembering to take her medications as prescribed, resulting in increased organization and concentration over the length of her case. Near the end, she faced the potential termination of parental rights regarding her youngest daughter, which increased her depressive and anxious symptoms. Although she tried to remain upbeat, she has few positive plans for the future." (Tr. 356.) On December 5, 2007, Plaintiff's mental health treatment at Blue Water Counseling with Dr. Lanni was reopened. (Tr. 350-51.) She was assessed with mood disorder NOS, dissociative disorder, PTSD, alcohol abuse, and it was noted to rule out MDD versus bipolar disorder, GAD. (Tr. 350.) As the ALJ pointed out, it was noted that Plaintiff "saw an improvement [with] the [V]yvanse [and] felt it worked better for her than previous: more able to focus [and] get things done." (Tr. 350.) She also reported that Wellbutrin did not work, and she felt she did better with Risperdal. (Tr. 350.)

The ALJ cited February 2008 mental health treatment notes that showed Plaintiff's improvement with medication and April 2008 notes showing increased irritability when she was out of medication. (Tr. 28, 353, 354.) Notes from July 2008 show she "did better when taking her

med, but continued to respond to life situations impulsively to the point of chaos [at] times." (Tr. 331.)

Plaintiff asserts that her lack of follow-through with treatment or medication was due to her ability to afford treatment. (Doc. 17 at 26.) The evidence does not show that treatment providers have identified this as a primary reason for her failure to follow through; other reasons are given throughout the record. For example, the ALJ cited records noting that Plaintiff struggled with attendance and she had to stop medication when she was pregnant. (Tr. 29, 448.) The record also shows she made progress when she began to consistently attend a "skills" class. (Tr. 448.) There are notes in the record that Plaintiff, at times, had private insurance. (Tr. 466.) Plaintiff argues, for instance, that notes from September 4, 2009, show that there were issues about her "ability to afford care/lack of insurance, not explored by the ALJ, yet held against her credibility in error." The September 2009 notes show that the "services covered under [Plaintiff's] benefit plan had changed and she did not meet medical necessity for an exception form allowing her to remain with CMH." (Tr. 510.) Plaintiff was "provided with options to continue counseling services with Port Huron Hospital Out Patient Program which accepts her . . . insurance." (Tr. 510.)

The ALJ considered a variety of factors in making his credibility determination. The ALJ also relied upon inconsistencies in Plaintiff's own testimony and reports.  He cited Plaintiff's testimony that she was allergic to marijuana and had not used recreational drugs since 2005, as well as two different records in which she reported sporadic marijuana use. (Tr. 33, 66, 490, 504.)  For example, in a May 2009 Inpatient Health Plan, the psychiatrist noted that Plaintiff

> [I]dentifies her drug of choice as marijuana and admits she has abused pain medications in the past. She is unclear about her present use, sometimes stating she has not used in over a year so that she can get her children back and at other times disclosing she smoked with friends to control her anger. It appears she has no specific

23

pattern of use and has cut down since she began participating in DBT and viewing this behavior choice as a self harming choice." (Tr. 490.)

The treatment provider noted that "DSM-IV supports a diagnosis of cannabis abuse." (Tr. 490.)

The ALJ also found that Plaintiff's testimony regarding the effectiveness of her medications was internally inconsistent as well as inconsistent with other evidence in the record. (Tr. 33.) Treatment providers have noted inconsistencies in her reports, as well. (Tr. 504.) One mental health treatment provider noted that Plaintiff "has a history of giving different information to her mental health physician and medical physician." (Tr. 504.)  At the December 27, 2005 mental health treatment appointment, the doctor noted that Plaintiff reported "at first she felt positive with Zoloft but then relates it made her more anxious." (Tr. 743.) The doctor noted that she was "inconsistent with reporting benefits or problems with Zoloft." (*Id.*)

The ALJ also pointed out that at the hearing Plaintiff had testified that she cannot watch a flat screen television because it immediately gives her a migraine, yet the screen used for the video hearing with the ALJ was a flat screen and the hearing lasted over an hour and half, during which Plaintiff continued testifying and remained responsive. (Tr. 32, 63-64.)

The ALJ properly explained his findings regarding Plaintiff's credibility, including the extent of her alleged symptoms and her physical and mental limitations. The ALJ's credibility finding is supported by substantial evidence in the record.

Finally, Plaintiff argues generally that the ALJ failed to evaluate and consider her severe and non-severe impairments in combination and therefore, the hypothetical questions did not accurately portray Plaintiff's limitations and the VE's responses cannot be relied upon as substantial evidence. (Doc. 17 at 28.)

As set forth above, the ALJ's findings regarding Plaintiff's impairments and the extent of her symptoms and limitations are supported by substantial evidence. The ALJ's RFC findings are supported by substantial evidence in the record, including Dr. Rudolph's evaluation and Dr. Marshall's opinion. (Tr. 123-24.) The RFC limits Plaintiff in her interactions with others, in the complexity of the work, and in the number of changes in the work setting, all areas of moderate limitations according to Dr. Marshall's opinion. (Tr. 122-24.) Dr. Marshall's opinion had the benefit of Dr. Rudolph's Psychological Mental Status Report. (Tr. 121, 606-08.) Plaintiff's physical limitations were discussed above, yet it bears noting that the evidence does not show exertional limitations greater than those set forth in the ALJ's RFC. Giving Plaintiff the benefit of the doubt with respect to the spells or episodes, the ALJ's RFC restricts all work around unprotected heights or moving machinery. (Tr. 24.)

In a hypothetical question posed to the VE, an ALJ is required to incorporate only those limitations which he finds credible and supported by the record and the ALJ did so. *See Casey v. Sec'y of Health and Human Serv.*, 987 F.2d 1230, 1235 (6th Cir. 1993). The VE's testimony is substantial evidence supporting the ALJ's finding that Plaintiff could perform a substantial number of jobs in the economy. The ALJ's findings at step five are supported by substantial evidence.

## G.    Conclusion

I therefore suggest that the ALJ's decision to deny benefits was within the range of discretion allowed by law, it is supported by substantial evidence and there is simply insufficient evidence to find otherwise. Defendant's Motion for Summary Judgment (doc. 22) should be granted, that of Plaintiff (doc. 17) denied and the decision of the Commissioner affirmed.

## III.   **REVIEW**

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985);  *Howard v. Sec'y of Health & Human Servs.,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan,* 474 F.3d at 837 (*citing Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987)). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.  E.D. Mich. LR 72.1(d)(3). The response shall be concise, but commensurate in detail with the objections, and shall address specifically, and in the same order raised, each issue contained within the objections.

s/ Charles E Binder

CHARLES E. BINDER
United States Magistrate Judge

Dated: October 17, 2014

26